N Jane DuBovy CSB#98817
Mandy S. L. Favaloro, CSB#239482
A2Z Educational Advocates
881 Alma Real Drive, Suite 309
Pacific Palisades, CA 90272
(310) 573-1430 Office
(310) 573 1425 Fax
njanedubovy@a2zedad.com

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT

| | |
|---|---|
| H.K., a minor, by and through her Parents, Erika Kemmerer and Michael Kemmerer, and on their own behalf, <br><br> Plaintiffs, <br><br>       v. <br><br> Santa Monica Malibu Unified School District, <br><br> Defendant | Case No.: 2:20-CV-674 <br><br> COMPLAINT AND PRAYER FOR RELIEF UNDER THE INDIVIDUALS WITH DISABILITIES EDUCATION IMPROVEMENT ACT (20 U.S.C. §1400 et seq.) and <br> COMPLAINT AND PRAYER FOR RELIEF FOR ATTORNEYS' FEES AND COSTS UNDER 20 U.S.C. §1415(i)(3). |

Plaintiffs, H.K., a minor, by and through her Parents, Erika Kemmerer and Michael Kemmerer ("Plaintiffs"), and on their own behalf, hereby submit their Complaint against Defendant, Santa Monica Malibu Unified School District ("District" or "Defendant.) Through its Complaint, Plaintiffs request judicial

review of the administrative decision issues by the California Office of Administrative Hearings ("OAH") on October 29, 2019 in the matter designated as OAH Case Nos. 2019040158/2019010897.  In support of their Complaint, Plaintiffs allege as follows.

## **INTRODUCTION**

1.     Plaintiffs request review of the OAH Decision rendered in the administrative hearing in the underlying matter.  This Complaint arises out of the IDEA and is brought pursuant to 20 U.S.C. §1425 and is timely as an appeal based on the authority of *Orange County Health Care Agency v. Dodge, et. al*, 793 F.Supp.2d 1121 (C.D. CA 2011).  This action is commenced to seek an order (1) reversing the decision of the California Office of Administrative Hearings, ("OAH") dated October 29, 2019, and (2) awarding appropriate relief under the Individuals with Disabilities Education Improvement Act (20 U.S.C. §§1415 et seq.) ("IDEIA").

## **JURISDICTION AND VENUE**

2.     This Appeal action arises under the IDEA.  This Court has jurisdiction of the matter under 20 U.S.C. §1415 and 28 U.S.C. §1331.  Pursuant to 20 U.S.C. §1415(i)(3)(A), the District Court's jurisdiction in this matter is without regard to the amount in controversy.

3.     Parents have exhausted all required administrative remedies in this matter by pursuing a due process case under the California Office of Administrative Hearings on all claims related to the provision of a free and appropriate public education

1

2    ("FAPE") alleged herein.

3    4.    Venue is proper is the United States District Court, Central District of

4    California, as authorized by 28 U.S.C. §§1391 & 1392.

5    **STANDARD OF REVIEW**

6    5.    In evaluating a case filed under the IDEA, the District Court "shall receive

7    the records of the [state] administrative proceedings, shall hear additional evidence

8    at the request of a party, and basing its decision on the preponderance of the

9    evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C.

10   §1415(e)(2).  The District Court proceeding "under the IDEA is a hybrid, akin to a

11   trial de novo."  *Union School District v. Smith*, 15 F.3d 1519, 1524 (9th Cir. 1994).

12   6.    Although, the District Court is required to give "due weight" to the decision

13   of the ALJ, and the "court must ultimately reach an independent decision based on

14   a preponderance of the evidence."  *Board of Education v. Rowley*, 458 U.S. 176,

15   205 (1982). "Congress intended 'judicial review in IDEIA cases to differ …

16   substantially from judicial review of other agency actions in which courts are

17   generally confined to the administrative record and are held to a highly deferential

18   standard of review.'"  *Amanda J. v. Clark County School District*, 260 F.3d 1106

19   (9th Cir. 2001) (*quoting Ojai Unified School District v. Jackson*, 4 F.3d 1467, 1471

20   (9th Cir. 1993).

21   7.    The reviewing court must determine whether the school district met the legal

22   requirements of the IDEA, based on the very specific facts of the particular case at

hand.  *See San Rafael ES District v. California Special Education Hearing Office*, 482 F.Supp.2d 1152, 219 Ed. Law Rep. 676 (N.D. Cal. 2007).

## PARTIES

8.      Plaintiffs in this proceeding are H.K., a minor child who resides with Parents, Erika Kemmerer and Michael Kemmerer; the individual Parents on their own behalf and on behalf of H.K. (hereinafter sometimes referred to as "Parents"). At all times relating to this matter Parents have resided in Santa Monica, California, within the boundaries of Defendant, Santa Monica Unified School District, ("SMMUSD" or "District").  Parents are responsible for the care, custody and control of H.K. a minor child with a disability.  H.K. has diagnoses that include but are not limited to ADHD, Unspecified Mood Disorder, Trauma-related Emotional Disorder and rule out diagnoses of neurobehavioral disorder related to prenatal alcohol exposure and OCD.

9.      Defendant SMMUSD is a public-school district duly organized and existing pursuant to the laws of the State of California, is located in Los Angeles County, California, and is a Local Education Agency ("LEA") within the meaning of the IDEA.  The District is a recipient of federal financial assistance for purposes of the IDEA.  At all times relevant, SMMUSD was and is the LEA responsible for providing to H.K. a Free and Appropriate Public Education ("FAPE") within the meaning of the IDEA.  SMMUSD is governed by the laws of the State of California, the laws of the United States, and the Constitution of the United States

in carrying out its duties and responsibilities.

## **STATEMENT OF FACTS**

10.    H.K. is a student who has at relevant times resided within the District, who has not yet been made eligible for special education and related services.  H.K.'s current school of residence within the District is John Adams Middle School but she was previously enrolled in Grant Elementary School from April 2015 when she was in 1st Grade.

11.    H.K. was adopted with a history of exposure to drugs in utero.  H.K. has a history of difficulties with school anxiety related to her disabilities.

12.    In January 2016, Plaintiffs began to see Stephanie Small, MFT, who specializes in children with trauma in their background for therapy to address H.K.'s ongoing anxiety issues.

13.    In 3rd Grade, H.K. was placed in a counseling group at Grant ES by Defendant.

14.    In October 2017, H.K. began psychiatric services with Dr. Lori Zukerman to address her ongoing mental health needs.

15.    In April 2018, H.K. began therapy with Ashley Graber in order to address her ongoing mental health needs.

16.    On April 26, 2018, H.K. was admitted to the Resnick Neuropsychiatric Hospital at UCLA (RNPH) for treatment of suicidal ideation, mood dysregulation and oppositionality. H.K would remain hospitalized through May 10, 2018.

17.     As a result of H.K.'s hospitalization, she became unable to attend regular school during the spring of the 2017-2018 regular school year ("RSY").

18.     Following her hospitalization, from May 16, 2018 to July 3, 2018, H.K. attended the UCLA Achievement Behavior, Cognition ("ABC") Partial Hospitalization Program at RNPH. ABC Child Programs are time-limited, integrated programs dedicated to assisting children ages 6-12 and their families to promote positive emotional and behavioral health.  The programs are based upon the most current evidence-based clinical practices and integrate positive approaches to patient care. H.K. was unable to participate in general education or attend a public school during the time she attended the ABC program.

19.     During her hospitalization and time in the ABC Program, H.K. was provided with individual, family and multi-family therapy sessions, participated in psychotherapy groups, was provided with educational instruction from a tutor in the program, and received ongoing medication management.

20.     H.K. was assessed while at the ABC program.  During the assessment process she presented as an emotionally fragile girl who was cooperative but became easily discouraged and required on-going encouragement to persevere. The assessors also noted that she exhibited difficulties with low mood, anxiety, and poor executive functioning which had existed over an extended period of time and to a marked degree, which were impacting her educational functioning and contributing to her becoming overwhelmed under normal circumstances.  The

report completed by the professionals at RNPH indicated that she demonstrated deficits in domains of focus, attention, impulsivity, and difficulties with social judgement.  The team also noted impairments in social functioning, including misinterpreting social cues and establishing appropriate boundaries with strangers and peers.  The assessors felt that these difficulties had begun to impact her functioning academically and socially and that it would be difficult to maintain appropriate participation without external supports as she moved forward in school.

21.    The assessors recommended, based on her time in the RNPH inpatient and outpatient programs and the assessments conducted, that even with medication stabilization she would continue to require external supports and specialized instruction in order to work to her potential, sustain adequate attention regulation, respond adequately to instruction, and sustain participation in goal-directed activities.  The team recommended that H.K. be evaluated for an IEP as soon as possible to determine and secure appropriate programming and services.

22.    Following her inpatient psychiatric hospitalization and completion of the UCLA ABC Program, H.K. maintained robust outpatient follow-up with twice weekly psychotherapy with her therapist, as well as follow-up with her outpatient psychiatrist for medication management.

23.    H.K. returned to Grant ES for 5th Grade in the fall of 2018.

24.    On or around October 9, 2018, H.K. reported to her 5th grade teacher that she

had found a note with sexually and racially graphic language on her desk and that she did not know who had written the note. She denied writing it herself.

25.     SMMUSD conducted initial assessments of H.K. in the fall of 2018-2019 school year. The District assessor conducted a psychoeducational assessment. The assessor determined that H.K. did not meet the eligibility criteria under any categories of the IDEA as he opined that none of her diagnoses resulted in an adverse effect on her educational performance. He did not address the fact that she had missed school the previous school year due to being hospitalized at the RNPH at UCLA.

26.     The District held an initial IEP on October 20, 2018. The IEP team, relying on the psychoeducational assessment, did not find that H.K. was eligible under the IDEA.

27.     H.K.'s 5th grade teacher participated in the IEP. She stated that H.K. was performing at grade level but was concerned about her emotional social state as these deficits were beginning to impact her. The teacher referenced the graphic note that H.K. wrote to herself.

28.     Thereafter, H.K. continued at Grant ES within the District. Thereafter, the District found that H.K. was a student with a disability for purposes of Section 504 of the Rehabilitation Act of 1973 and developed a "504 Plan," which was implemented after the winter break in January 2019.

29.     In November 2018, H.K. wrote in her journal that she would get "really mad

sometimes," but didn't "know how to deal with it" and then gave examples of "faking suicide," "faking injuries" and "faking sadness." She also reported that she had faked the note that she found in her desk in October 2018.

30. On December 6, 2018, Parents, through their attorney, wrote to the District, regarding the October 22, 2018 IEP. Parents noted that they disagreed with the District's determination that H.K. was not eligible for special education and related services. It was noted that prior to the IEP, Parents had provided the District with a number of assessments from professionals at UCLA who had worked with H.K. extensively during the previous Spring and Summer during her hospitalization, and whose findings supported eligibility for special education and related services. Parents also stated that the findings made by UCLA, which included diagnoses of ADHD, unspecified mood disorder, and trauma-related emotional disorder, were largely ignored by the IEP team. The team also ignored the fact that H.K. had missed school the previous Spring due to her hospitalization, when determining that her disabilities did not affect her ability to receive an educational benefit.

31. On January 14, 2019, Dr. Nicholas Thaler, Ph.D., at the request of Parents, conducted a school observation of H.K. ahead of completion of testing for a Neuropsychological Evaluation. Dr. Thaler found that H.K. was initially attentive and quiet but became increasingly more fidgety and distractible throughout the 60-minute observation. H.K. was observed to chat with peers instead of working. When it was time to take a test, H.K. appeared uncertain on how to proceed,

appeared confused, worked very slowly, and asked the teacher for help four times throughout the test, while other students, at most, asked for help one time.  H.K. was behind and another student was allowed to assist her with the test.

32.    Dr. Thaler saw clear executive functioning difficulties interfering with her ability to sit still during the test.  Dr. Thaler also felt that the difference in scores between the UCLA LAS and SMMUSD LAS reports could be due to executive functioning issues that would affect her performance from day to day.  He also felt, based on the review of the records that her frontal executive deficits would make it hard to inhibit and regulate emotions causing her to give in to her impulses.  Dr. Thaler's diagnostic impressions included ADHD and possibly disruptive mood regulation disorder.

33.    On January 22, 2019, H.K. bought a paring knife to school after putting it in her backpack at home.  At the urging of peers, who saw the knife, she reported to the principal that she had brought the knife to school.  She reported that she had cut her arms with the knife.

34.    The school principal, interviewed H.K. and completed a "Suicide Risk Assessment Protocol."  H.K. reported that she had thought about hurting herself but didn't know what brought on the thoughts but that she had thought about it the previous night after having a fight with Parent.  She reported that she had tried to hurt herself before the last time she had been hospitalized.  She reported that she did not feel like hurting herself at the time of the interview as she did not have a

plan but did have access to kitchen knives. The principal also noted that she was experiencing severe psychological distress. He reported that her level of suicide risk was high as she had many risk factors and difficulty identifying a support system.

35.    The school called the Psychiatric Mobile Response Team (PMRT) but the Santa Monica Police Department arrived first and took her to the UCLA ER where she was placed on a 5150 psychiatric hold. H.K. was admitted to the pediatric psychiatric ward approximately 24 hours later. H.K. remained in the hospital for one week, during which time she was unable to attend school.

36.    The UCLA RNPH team reported that during this inpatient admission H.K. demonstrated deficits in the domains of impulsivity, focus, attention, and appropriate social judgement. The team reported that H.K. historically stabilized in highly structured facilities and programs with small group settings and individualized approaches to care. During this hospitalization, she was noted to be intermittently tearful and irritable when she felt her needs were not being immediately addressed by staff. She was reported to require frequent prompts by staff members for restless, intrusive behaviors, and tested the limits of the unit, and was noted to display poor insight into her mental health symptoms. She displayed deficits in her communication skills, specifically regarding to her ability to appropriately identify and express her emotions with staff and her family. The team reported that during the course of her admission she displayed improvement

in her functioning, and most specifically in her suicidal ideation.

37.    The UCLA noted that despite historical mental health interventions, and ongoing mental health treatment following her first hospitalization, H.K. had continued to display a notable decline in her emotional well-being at home and at school.  The team noted that a second hospitalization within such a short period of time, coupled with the seriousness of her suicidal ideation at school, highlighted that H.K. continued to require more accommodations and supportive interventions than were currently being offered at school.  The team opined that given the prevalence of her difficulties, the increase over time, and the pervasive nature of her difficulties related to her diagnostic profile, even with the supports already in place at home and school, that she would require direct, individualized, and specialized supports at school in order to sustain adaptive school functioning, access the curriculum, and benefit from instruction.

38.    The UCLA team recommended that she have an IEP to address deficits related to the areas of organizational skills, work/task planning for school and homework assignments, and implementation of study schedules.  They also recommended direct instructional support to assist in repetition of learned materials over multiple days and the breaking down of complex materials into more simplified and accessible information.  The team further recommended school-based individual counseling and group counseling to assist with behavioral support accessing learned adaptive coping skills, maintaining appropriate

relationships, and adaptive social skills. The team felt that she would also benefit from a smaller, more specialized educational setting with greater access to individualized academic and mental health resources and counseling.  The team felt that without the proper supports in place H.K. would continue to decline despite outpatient management and require more frequent inpatient hospitalizations, especially with the increased requirements and expectations for independent application of skills in her areas of weakness.

39.    After her return to school, another IEP was held on February 11, 2019 at the request of Parents.  Dr. Thaler and a member of the team at UCLA participated in the meeting and shared their opinions that H.K. should be found eligible for special education. Again, the District members of the IEP team did not find H.K. eligible as a student with a disability under the IDEA. The District IEP team members did not feel that the event that precipitated her recent hospitalization was sufficient to reopen the discussion regarding eligibility because, according to the school psychologist, while the event was "frightening," H.K. had gone to the principal to report that she had the knife, and therefore, that there was no adverse effect that had manifested at school related to her disabilities.

40.    The IEP team, however, failed to address the fact that H.K.'s academic performance had remained stable at the sacrifice of her social-emotional well-being, which was not adequately being addressed as made clear by the fact that she harmed herself and brought a knife to school.

41.    On March 20, 2019, Parents responded to the February 2019 IEP.  Parents noted that the District had ignored the recommendations of the treating professionals regarding H.K.'s eligibility and had not ensured that decisions about her eligibility had been made based on trauma-informed practices.   Parents noted that a combination of factors, including two hospitalizations, a lengthy partial hospitalization treatment program, incidents of suicidal ideation, incidents of self-harm, and bringing a weapon onto a school campus, clearly evidenced that H.K. had engaged in behaviors that were quite severe and indicative of an ongoing, pervasive pattern of significant needs arising from her various disabilities, which had manifested at school and were impacting her access to school.

42.    In concern for H.K.'s ongoing social/emotional struggles and the fact that H.K would now be entering into middle school, Parents provided notice to the District of their unilateral placement of H.K. at Westmark, a school designed to support students who have disabilities such as those displayed by H.K.  Parents also filed for due process regarding the District's failure to make H.K. eligible despite the two hospitalizations for emotional issues and the missing of over 2.5 months of schooling over the prior two school years.

43.    On January 23, 2019, the District filed a Due Process Complaint with OAH. On April 3, 2019, Parents, through their Attorney, filed a Due Process Complaint with OAH.  The matters were consolidated under the District's case number of 2019010897.

44.    Parents unilaterally placed H.K. at Westmark, a private school that provides specialized educational support to students with learning differences in a small setting, for the 2019-2020 school year given their continued disagreement with the District's failure to make H.K. eligible or offer her a FAPE.

45.    On August 12, 2019, Dr. Thaler completed the Neuropsychological Evaluation of H.K. Dr. Thaler noted that H.K. had moderate to severe struggles with her executive system, which was certainly due to her complex psychiatric and neurodevelopmental history.  Dr. Thaler found that these impairments underlie many of her emotional, behavioral, and academic difficulties.

46.    Dr. Thaler found that H.K. met eligibility for special education under Emotional Disturbance (ED) and Specific Learning Disorder (SLD).  He found that H.K.'s prior diagnoses of trauma-related emotional disorder and unspecified mood disorder could be categorized as Complex Post-Traumatic Stress Disorder (C-PTSD), which is marked by chronic exposure to a traumatic stressor that results in longstanding emotional dysregulation, detachment and negative views of oneself and others.  He found that H.K. presented with low self-esteem, and that her attachment issues were well-documented in educational and medical records, and reports by her Parents and teachers.  He noted that her C-PTSD was the driving force behind her inappropriate behaviors at school, including planting threatening notes in her desk and bringing a knife to school, with the explicit intent to self-harm.  Dr. Thaler opined that the fact that H.K. missed approximately two months

of school as a direct result of her C-PTSD strikingly displayed the direct and adverse impact her ED had on her education.

47.     Dr. Thaler also found that H.K. met eligibility criteria under SLD in reading as she had average intellectual development but consistent delays in reading comprehension, which adversely impacted her ability to comprehend grade-appropriate information. Dr. Thaler opined that without intervention H.K.'s academics would further deteriorate as curriculum shifted from acquisition of skills to a greater focus on abstract reasoning and critical thinking skills.

48.     The hearing in the due process matter took place on September 4, 5, 10, 11 and 12, 2019.

49.     Plaintiffs' expert witnesses testified that H.K. demonstrated inappropriate types of behaviors under normal circumstances across settings since at least April 2018, one of the factors for qualifying for special education as a student with ED. Multiple witnesses testified that H.K. had demonstrated a pattern of self-harm, suicidal ideation, anxiety, difficulties with peer relationships, and deficits in coping skills, all of which were evidence of a pervasive pattern of significant needs that had manifested at school and had impacted her access to her educational program. Student's 5th grade teacher testified that she was aware of some of these inappropriate behaviors under normal circumstances, including engaging in negative self-talk, responding to peer conflict inappropriately, verbalizing she was not keeping up academically, and making poor social choices.  District witnesses

testified, however, that they did not consider all of H.K.'s behaviors over a long period of time but rather only behaviors that had occurred within 60 days of when Parents consented to assessments.

50.    Student's expert witnesses also testified that H.K. met criteria for Other Health Impaired (OHI) and SLD.

51.    District witnesses further testified that H.K. did not qualify for special education as she was making academic progress in school but ignored her two removals from school, which resulted in a loss of educational instruction, due to suicidal ideation and for bringing a weapon to school.

52.    Student's expert witnesses testified that H.K. required special education and related services.  Student and District witnesses testified that H.K. was already receiving private mental health services to address her ongoing issues at school, counseling support at school, accommodations implemented by her 5th grade teacher,  and additional services and accommodations provided via her 504 Plan that were not provided to other students in her class.

53.    Student's expert witnesses testified that Westmark was appropriate to meet H.K.'s unique needs as she required an environment with a smaller class size with embedded supports to provide monitoring on an ongoing basis of her needs. Expert witnesses also testified that a traditional public-school setting was no longer appropriate for H.K. because she would not have the support she required throughout the day for emotional regulation, which could result in further

hospitalizations.

54.     On October 29, 2019, OAH issued a Decision in the matter wherein the ALJ found that the District prevailed on all issues.

55.     In the underlying matter, the ALJ found that the District did not procedurally or substantively deny H.K. a FAPE in either the October 2018 or the February 2019 IEPs.  In finding that Plaintiffs did not prevail on their claim that Defendant failed to consider their concerns during either IEP meeting, the ALJ erroneously failed to mention the substantial evidence as to Parents' significant ongoing concerns known to the Defendant at that time, including prior correspondence with the Defendant about H.K.'s needs and the testimony of Parent regarding their concern about H.K.'s transition to middle school.

## SUBSEQUENT FACTS

56.     Subsequent to the hearing, Parents reported incidents with H.K. at Westmark that are consistent with the behaviors that gave rise to Parents' concerns while she was placed in SMMUSD.  However, based on the fact that Westmark is a school specifically designed to educate students with educational needs that are similar to those of H.K., the incidents have been handled effectively and H.K. has been able to continue access her educational program with support without the need for additional hospitalizations.

57.     Subsequent to the hearing, Defendant contact Plaintiffs to schedule an IEP to review the results of Dr. Thaler's assessment in January 2020 and review if

Student met eligibility for special education and related services. The IEP has yet to be held as of the date of the filing of this Complaint.

58.    It continues to be evident that H.K. has a qualifying disability such as to render her eligible under the IDEA and that those professionals working directly with H.K. agree as to her educational needs as identified under the IDEA.

## FIRST CLAIM FOR RELIEF

**Defendant's failure to find Student eligible for special education and related services from April 2018 denied Student a FAPE, and the ALJ erred in her finding that Student was not eligible for special education and related services.**

59.    Paragraphs 1 through 58 are re-alleged herein as if fully restated.

60.    The conduct of Defendant as alleged herein has violated and continues to violate Parents' right to meaningful participation and denied Plaintiff H.K.'s right to a FAPE as guaranteed under IDEA by not finding H.K. eligible for special education and related services.

61.    Defendant's failure to find Student eligible for special education and related services under either ED, OHI or SLD at all times from April 2018, denied Student a FAPE.

62.    The ALJ erred in her finding that H.K. was not eligible for special education and related services under either ED, OHI or SLD.

63.    Under the law, ED means a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that

adversely affects a child's educational performance: (A) an inability to learn that cannot be explained by intellectual, sensory, or health factors; (B) an inability to build or maintain satisfactory interpersonal relationships with peers and teachers; (C) inappropriate types of behavior or feelings under normal circumstances; (D) a general pervasive mood of unhappiness or depression; or (E) a tendency to develop physical symptoms or fears associated with personal or school problems.  *See* 5 CCR §3030 (b)(4); 20 U.S.C. §1414(3)(A); 34 C.F.R. §300.8(a)(1); and 34 C.F.R. §300.306.

64.    A student is eligible for special education under the category of OHI if she demonstrates limited strength, vitality, or alertness due to chronic or acute health problems which adversely affect his or her educational performance. *See* 5 C.C.R. §3030(b)(9); 20 U.S.C. §1414(3)(A); 34 C.F.R. §300.8(a)(1); and 34 C.F.R. §300.306.

65.    A student meets eligibility for SLD if they have "a disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, that may have manifested itself in the imperfect ability to listen, think, speak, read, write, spell, or do mathematical calculations, including conditions such as perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia. The basic psychological processes include attention, visual processing, auditory processing, sensory-motor skills, cognitive abilities including association, conceptualization and expression."

5 CCR §3030(b)(10); *see also* 20 U.S.C. §1414(3)(A); 34 C.F.R. §300.8(a)(1); and 34 C.F.R. §§300.306, 300.307, and 300.309.

66.    Here, Defendant failed to find H.K. eligible at all relevant times and failed, therefore, at the October 2018 IEP and the February 2019 IEP to find H.K. eligible under ED, SLD or OHI for special education and related services and failed to develop a substantively appropriate program designed to meet her unique needs and provide her with an educational benefit.

67.    The ALJ erred by ignoring considerable testimonial and documentary evidence that demonstrated that by at least April 2018, and at the subsequent October 2018 and February 2019 IEPs, H.K.'s needs were not being fully addressed via the general education program.

68.    The ALJ erred as a matter of fact in her finding that the only significant behavioral incident that occurred prior to the October 2018 IEP meeting, the explicit note, was not discovered to be written by Student until December 2018. Evidence and testimony established, however, that the team knew at the time of the October 2018 IEP meeting that the note was written by H.K.  The ALJ relied on this fact when making her finding that H.K. did not exhibit characteristics of emotional disturbance prior to the October 2018 IEP.  This finding was an error of fact as it is contrary to the facts in evidence.

69.    The ALJ erred as matter of fact in her finding that Student was absent for only "three weeks of school" during the 2017-2018 school year when the evidence

established Student missed the last six weeks of school during the 2017-2018 school year. The ALJ relied on this fact when making her finding that H.K.'s educational performance was not impacted by her characteristics of emotional disturbance. This finding was an error of fact as it is contrary to the facts in evidence.

70. The ALJ erred as a matter of fact and law by not taking into consideration Student's first hospitalization in April 2018 for suicidal ideation as a characteristic of ED that was present over a "long period of time" because it had occurred six months prior to the October 2018 IEP. The ALJ ignored testimony from multiple witnesses that Student continued to require continued mental health support during that time period in order to address her mental health needs.

71. The ALJ erred as a matter of fact in her finding that following Student's return to school on January 30, 2019, following her second hospitalization, Defendant "added additional supports to her 504 Plan, including counseling with [the school psychologist] for 30 minutes per week." This is in direct contradiction to testimony and evidence presented at hearing as the 504 Plan was not revised at that time and only provided for "weekly check-ins with the school psychologist or counselor as needed," while the 30 minutes per week of counseling was a notation on Student's "Re-entry to School Plan." The ALJ relied upon this fact when making a finding that Student's needs were being met without being made eligible for special education. This finding was an error of fact as it is contrary to the facts

in evidence.

72.    The ALJ abused her discretion by ignoring testimony establishing that H.K. exhibited characteristics of emotional disturbance "over a long period of time and to a marked degree" from at least April 2018, and at the time of the October 2018 IEP and February 2019 IEP, that were "adversely affects a [H.K.'s] educational performance." *See* 5 CCR §3030 (b)(4).  Multiple witnesses testified that H.K. exhibited a number of characteristics of ED from at least April 2018, the time of her first hospitalization for suicidal ideation, through her second hospitalization in January 2019, for bringing a knife to school and cutting her arm.  The ALJ failed to consider information outside of  H.K.'s grades and academic scores when considering whether H.K.'s "educational performance" was impacted by failing to consider her extended absences from school for six weeks at the end of the 2017-2018 school year  and for a week during the 2018-2019 school year, in order to qualify under ED.  The ALJ's erred by not taking into consideration the testimony of witnesses regarding how H.K. met eligibility criteria under ED.

73.    The ALJ abused her discretion and erred in giving little weight to Dr. Thaler's testimony that H.K. met eligibility requirements under ED and SLD.  The ALJ indicates that she provided little weight to Dr. Thaler's testimony based on the fact that he had not discussed with Student's 5th grade teacher, Mrs. Smith,  her "academic or social performance at school," but this ignores the testimony and evidence that both Dr. Thaler and Mrs. Smith were both present at the February

2019 IEP meeting, where both Dr. Thaler and Ms. Smith shared their concerns. The ALJ also noted that Dr. Thaler's report and its recommendations had not been provided to the IEP team in October 2018 or February 2019 as therefore the team "could not consider his findings or recommendations." This ignores the evidence and testimony that Dr. Thaler provided preliminary findings and recommendations to the IEP team in February 2019. The ALJ erred in not taking into consideration testimony provided by Dr. Thaler regarding the fact that H.K. met eligibility under ED and SLD.

74.    The ALJ erred as a matter of fact in her finding that Ms. Small did not observe Student at school, and therefore lacked credibility. This was in direction contradiction to Ms. Small's own testimony that she had had the opportunity to observe Student at school. The ALJ erred by not taking Ms. Small's testimony or history with Student into consideration when determining if Student met eligibility requires for special education and related services.

75.    The ALJ erred as a matter of fact and law in her finding that Defendant "did not believe Student's attention deficits adversely impacted Student's educational performance to a degree that she required services outside of the general education environment" when determining that Student did not meet eligibility criteria for OHI. This fact was directly contradicted by evidence and testimony that the District felt H.K. required school-based counseling outside of the general education classroom. Adopting this opinion as a finding was an error as a matter of

law because it misstates the legal requirements of eligibility under OHI under state and federal law.

76.    The ALJ erred as a matter fact by finding that there was "no significant discrepancy between Student's ability and achievement." This is in direction contradiction with Dr. Thaler's testimony and evidence presented at hearing, which the ALJ did not consider when making her cursory conclusion that H.K. did not meet SLD eligibility. The ALJ erred by not taking Dr. Thaler's testing or evidence into consideration regarding H.K.'s eligibility under SLD.

77.    The ALJ erred as a matter of law in her finding that because Student's teacher could support her needs in general education through teaching strategies and supports that Student did not require special education.  Adopting this opinion as a finding was an error as a matter of law because it presumes that a student who is eligible for special education and related services can only be educated by a special education teacher in a special education classroom, which is contrary to the legal requirements of the IDEA.

78.    Based on the foregoing the ALJ erred in her determination that H.K. was not eligible for special education and related services under ED, OHI, or SLD.

## **<u>SECOND CLAIM FOR RELIEF</u>**

**Defendant failed to make FAPE available to H.K. at all times since April 2018, including placement in an appropriate program that would meet her needs and provide her with an educational benefit, and the ALJ erred in determining that Defendant did not deny Student a FAPE.**

79.     Paragraphs 1 through 78 are re-alleged herein as if fully restated.

80.     The conduct of Defendant as alleged herein has violated and continues to violate Plaintiff H.K.'s right to a FAPE as guaranteed under the IDEA. Defendant failed to meet its legal obligation under the IDEA and California law to offer and provide Student with a program that met her unique needs and provided her with a meaningful educational benefit.

81.     A substantive FAPE is a program that is reasonably calculated to enable the child to receive educational benefit and tailored to the unique needs of the child. *See Board of Education v. Rowley*, 458 U.S. 176 (1982); 20 U.S.C. §1401(9). The IEP must be appropriately ambitious in light of the child's circumstances and allow the child to meet challenging objectives. *Endrew F. v. Douglas County School District RE-1*, 137 S. Ct. 988 (2017).

82.     Here, Defendant failed to offer and provide H.K. with a FAPE at all times since April 2018, including in the October 2018 IEP and the February 2019 IEP, by failing to find H.K. eligible, failing to be responsive to her significant mental health needs that were impeding her ability to access and benefit from her education and thereby failing to develop a substantively appropriate program designed to meet her unique needs and to provide her with educational benefit.

83.     The ALJ erred in her finding that that since Student was not eligible for special education and related services that the District, therefore, did not deny Student a FAPE.  Student should have been eligible as discussed, *supra*, and as a

Student with a disability within the District , she was entitled to a FAPE at all times.

84.    The ALJ erred by ignoring considerable testimonial and documentary evidence that demonstrated that by the time of the October 2018 IEP meeting, and again by the time of the February 2019 IEP meeting, it was clear that H.K.'s needs were not being addressed by Defendant.

85.    Based on the foregoing the ALJ erred in her determination that Defendant was not denied a FAPE because she was not eligible for special education and related services and that Defendant provided H.K. a FAPE by providing her with an educational benefit within the December 2018 504 Plan.  Defendant violated the IDEA and California law and denied Student a substantive FAPE at all times from April 2018, including the October 2018 IEP and the February 2019 IEP.

## THIRD CLAIM FOR RELIEF

**Defendant's procedural violations resulted in a failure to ensure meaningful parent participation from April 2018, including but not limited to the October 2018 IEP and the February 2019 IEP, and denied Student a FAPE, and the ALJ erred in determining that the District did not impede Parents' meaningful participation in the IEP process by committing procedural violations.**

86.    Paragraphs 1 through 85 are re-alleged herein as if fully restated.

87.    The conduct of Defendant as alleged herein has violated and continues to violate Parents' rights to meaningful participation in the IEP process and Student's right to a FAPE as guaranteed under the IDEA.

88.     Adherence to the mandated procedural requirements of the IDEA requires participation by parents, and this adherence is critical because it is designed to result in special education and related services that are tailored to the unique needs of the particular child.  *See Endrew F. v. Douglas County Sch. Dist.*, RE-1, 137 S. Ct. 988 (2017).  Failing to ensure meaningful participation by parents necessarily results in a denial of FAPE, regardless of whether the IEP complies with substantive requirements of the IDEA.

89.     The law indicates that a procedural violation constitutes a denial of FAPE if it (1) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to their child, or (2) caused a loss of educational benefits to the child. 20 U.S.C. §1415(f)(3); 34 C.F.R. §300.513(a)(2); Cal. Educ. Code §56505(f).  Here Defendant failed to have an IEP in effect at the start of the 2018-2019 school year and 2019-2020 school year, and failed to consider Parents' concerns and the results of private assessments in determining eligibility and developing a program for Student. *See* 20 U.S.C. §1414(d)(2)(A); 34 C.F.R. §300.323(a); 20 USC §1414(d)(3)(A)(ii); 34 CFR §300.324(a)(ii); and Cal. Educ. Code §56341.1(a)(2).  These violations of the procedural requirements each caused a loss of educational benefits and denied meaningful participation.

90.     Defendant violated procedural requirements of the IDEA from April 2018, including but not limited to in the development of the October 2018 IEP and the

February 2019 IEP, which resulted in a failure to ensure meaningful parent participation, and denied Student a FAPE.

91.     The ALJ erred by failing to take into consideration evidence and testimony that Parents had requested an IEP prior to the end of the 2017-2018 school year during the time of Student's first hospitalization.

92.     The ALJ erred by failing to take into consideration evidence and testimony that Defendant did not take information from the assessments and information provided by Parents at the time of the October 2018 IEP into consideration when making a determination regarding Student's eligibility, including but not limited to Student's first hospitalization, as it was outside of the assessment timeline. Defendant failed to include Parents as equal participants in the process.

93.     Defendant failed to meet its legal obligation under the IDEA and California law to ensure meaningful Parent participation, which resulted in a loss of educational benefit thereby procedurally denying Student a FAPE when Defendant failed to find Student eligible for special education and related services and failed therefore to have an IEP place for Student.

94.     The ALJ erred in determining that Defendant did not impede Parents' meaningful participation in the IEP process by committing procedural violations, which led to the determination that Student was not eligible for special education and related services.

## <u>FOURTH CLAIM FOR RELIEF</u>

**Defendant denied Student a FAPE by failing to conduct an appropriate psychoeducational assessment in October 2018 that assessed in all of Student's suspected areas of disabilities, that used a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, and the ALJ erred by finding that Defendant's assessment was appropriate.**

95.    Paragraphs 1 through 94 are re-alleged herein as if fully restated.

96.    The conduct of Defendant as alleged herein has violated and continues to violate Parents' rights to meaningful participation in the IEP process and Student's right to a FAPE as guaranteed under the IDEA.

97.    A student must be assessed in all areas related to his or her suspected disability, and no single procedure may be used as the sole criterion for determining whether the student has a disability or determining an appropriate educational program for the student. *See* Cal. Educ. Code §56320(e) & (f); *see* 20 USC §1414(b)(2); 34 C.F.R. §§300.304(b)(2) & (c)(4). The tests and assessment materials must be validated for the specific purpose for which they are used; must be selected and administered so as not to be racially, culturally or sexually discriminatory; and must be provided and administered in the student's native language or other mode of communication. *See* Cal. Educ. Code §56320(a); 20 USC §§1414(b)(2) & (3); 34 CFR §§300.304(c)(1)(i) & (ii).

98.    Defendants failed to conduct an appropriate assessment psychoeducational assessment in October 2018.

99.    The ALJ erred in her finding that Defendant's October 2018 Psychoeducational assessment was appropriate and met required legal standards,

100.    The ALJ abused her discretion and erred by ignoring considerable testimonial and documentary evidence that demonstrated that Defendant's assessments failed to use a variety of assessment tools and failed to take all relevant information into consideration.

## FIFTH CLAIM FOR RELIEF

**Parents are entitled to reimbursement for their unilaterally funded services and placement.**

101.    Paragraphs 1 through 100 are re-alleged herein as if fully restated.

102.    Parents are entitled to reimbursement if a unilateral placement or services meet the child's needs and provided the child with an educational benefit, and it is not necessary for the private placement or services to meet the strict IDEA definition of a FAPE, or that it is certified to provide special education. *See Florence Cty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 16 (1993).

103.    Under the IDEIA reimbursement remedies are part of the court's resources in crafting "appropriate relief" and therefore equitable considerations are relevant once the court determines that the placement was appropriate. *See Sch. Comm. Of the Town of Burlington v. Dept of Educ.*, 471 U.S. 359, 374 (1985); *see also* 20 U.S.C. §1412(a)(10)(C)(iii); 34 C.F.R. §300.148(d).

104.    Parents are entitled to reimbursement for the unilateral placement due to the

procedural violations committed by Defendant in this matter, including but not limited to Defendant's failure to have an IEP in effect at the start of the 2018-2019 school year, and to consider Parents' concerns and the results of private assessments in determining eligibility and developing  a program for Student.

105.   Parents have funded ongoing private therapy services at all times since April 2018.  Without these therapy services Student would have been unable to attend her educational program.

106.   Parents placed H.K. at Westmark, a school that specializes in addressing the types of educational needs that are pertinent to H.K.  At no time prior to this unilateral placement did the District make FAPE available to Student.  Without this placement Student would not have been able to successfully continue attend an educational program.  Parents are entitled to reimbursement if the unilateral placement met the child's needs and provided the child with an educational benefit. *See Florence Cty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 16 (1993).

107.   Furthermore, the equitable factors in this matter weigh in favor of reimbursement to Plaintiffs for placement at Westmark.  The ALJ did not take those factors into consideration given her erroneous finding that Defendant prevailed on all issues.

108.   In this matter Plaintiffs provided the District with notice of their intent to enroll H.K. in a private placement in writing. *See* 20 U.S.C. §1412(a)(10)(C)(iii)(I)(aa).  Furthermore, at no time did Plaintiffs' act

unreasonably in this matter.  Defendant presented no evidence that Plaintiffs acted unreasonably and the ALJ made no finding that Plaintiffs acted unreasonably in other matters.  *See* 20 U.S.C. §1412(a)(10)(C)(iv).

109.    Following a *reversal* of the ALJ's decision in this matter by this Court, it must then take into consideration the equitable factors in this matter and find that the totality of the evidence supports full reimbursement to Plaintiffs for private therapy services provided and for placement of H.K. at Westmark.

110.    The ALJ erred as a matter of law when she failed to award reimbursement for the unilateral services and placement provided to H.K. from April 2018 forward.

## SIXTH CLAIM FOR RELIEF

**Plaintiffs seek payment/reimbursement of their reasonable attorneys' fees and costs incurred in this action.**

111.    Paragraphs 1 through 110 are re-alleged herein as if fully restated.

112.    Pursuant to the IDEA, Parents are entitled to payment/reimbursement of their reasonable attorneys' fees and costs from SMMUSD if they are the prevailing party in this action, both for the costs incurred in the underlying matter and for pursuit of the present case.

## PRAYER FOR RELIEF

113.    Plaintiffs request that this Court enter an order requiring the entire administrative record, including Exhibits, Transcripts, Briefs, Pleadings and the

ALJ's Decision, to be filed with the Court;

114.    Plaintiffs request that this Court, upon complete review of the entire administrative record, find that the decision of the ALJ that Student was not eligible for special education and related services be reversed;

115.    Plaintiffs request that this Court, upon complete review of the entire administrative record, find that the decision of the ALJ that Defendant did not deny Student a FAPE be reversed;

116.    Plaintiffs request that this Court, upon complete review of the entire administrative record, find that the decision of the ALJ that Defendant did not impede Parents' meaningful participation in the IEP process by committing procedural violations be reversed;

117.    Plaintiffs request that this Court, upon complete review of the entire administrative record, find that the decision of the ALJ that Defendant's October 2018 Psychoeducational assessment was appropriate be reversed;

118.    Plaintiffs request that this Court grant such relief as it deems just and appropriate under IDEA, including:

      a.  An order that Plaintiffs be reimbursed for the full cost of and all expenses related to therapeutic services provided to Student from April 2018 forward, as well as for the costs of transportation;

      b.  An order that Plaintiffs be reimbursed for the full cost of and all expenses related to the cost of Dr. Thaler's assessment;

c. An order that Plaintiffs be reimbursed for the full cost of and all expenses related to H.K.'s unilateral placement at Westmark for the 2019-2020 school year forward, as well as for the costs of transportation.

119.   The Plaintiffs request that this Court order the Defendant to pay Plaintiffs' reasonable attorneys' fees and costs incurred by Plaintiffs related to the underlying due process hearings in this matter;

120.   The Plaintiffs request that this Court order the Defendant to pay Plaintiffs' reasonable attorneys' fees and costs incurred in preparation and prosecution of this matter; and

121.   Plaintiffs request that this Court award them any such other and further relief as may be deemed by the Court to be appropriate.

Dated:      January 22, 2020

By: /S_____

N  Jane DuBovy
A2Z Educational Advocates
Attorneys for Plaintiffs
H.K., a minor, and
Erika and Michael Kemmerer

PLAINTIFF'S COMPLAINT                                                                        35